BLAIR ET AL v. THE NORTH WESTERN OHIO NATURAL GAS CO. AND THE OHIO OIL CO.

CONSTRUCTION OF A GAS AND OIL LEASE,

Where a gas and oil lease was made for a term of five years "and as much longer as oil or gas is found in paying quantities," and a well had been drilled which produced gas in paying quantities for a number of years, and for which the annual rental had been promptly paid, the lesee, having performed all the conditions incumbent to be performed by him, is entitled to a reasonable time after such well is exhausted, to drill at other locations on the premises to find oil or gas in paying quantities, and for that purpose and during such time, the lease continues in full force.

PRICE, J.

In April, 1895, the plaintiffs commenced this action to enjoin the the defendants from entering upon a certain piece of land in Hancock county, described in the petition as containing 79 acres, and from hauling timber and lumber thereon and drilling for oil, which the defendants threaten and contemplate doing; and it is averred that they will drill for oil on the premises unless restrained by injunction.

In their petition it is averred, "That said land and all and every part thereof, is supposed and probably is valuable oil land, and capable of producing oil in paying quantities," and that if defendants are permitted to take oil from the premises and carry the same away, it will be impossible for the plaintiffs to measure and determine the quantity or value thereof, and thereby the plaintiffs will suffer great and irreparable injury.

There are other averments of numerous threatened trespasses and reasons why the injunction should be granted.

The defendants answer jointly, and admit that the plaintiffs own, in fee, the lands described in the petition, and that they as corporations were attempting to take lumber and timber onto the premises and drill for oil, and they, at length, set up by cross petition their right to do so. They agree with the plaintiffs, that the premises are probably good oil producing territory, and that it was and is their purpose to develope the same for the production of oil, and for that purpose they were hauling lumber and timber and other materials onto the lands, when enjoined by order of the lower court.

The undisputed facts which are disclosed by the pleadings, show, that on the 14th day of September, 1886, the plaintiffs, with their sister, Mary J. Williams, as heirs of John Blair, demised and granted to The Olean Oil Company and its assigns the said premises for the purpose and with the exclusive right of drilling and operating for petroleum oil and gas, *with the right to sub-let and subdivide all said* real estate consisting of 109 acres. The grant was for the term of five years from Septenber 14, 1886, *"and as much longer as oil or gas is found in paying quantities."*

If oil was found, the lessors were to receive in tank or pipe line one-eighth part thereof. "If gas was found in quantities to utilize and sell, the consideration in full to the lessor *should be $100 per annum for each and every gas well drilled on said premises and so used."*

The right of way over the premises to the place of operations was also granted, together with the exclusive right to lay pipes to convey oil and gas. These stipulations of the lease are made to extend to the heirs, executors and assigns of the parties. The lease was recorded on the 8th day of February, 1887.

On the 28th day of December, 1886, The Olean Oil Company, in writing and for value, duly assigned and transferred said lease with all its rights and privileges to Hascal L. Taylor, his heirs and assigns. Within the first year from the date of the lease, Taylor drilled a well on the premises which produced gas in paying quantities. This was required to be done within the first year to save the lease from forfeiture.

There was no time fixed or provided within which any other well should be drilled, nor is it provided in the terms of the lease that any additional wells must be drilled. The $100 rental for the well was paid, and on the 6th day of July, 1889, Taylor assigned and transferred the lease to the defendant, The Northwestern Ohio Natural Gas Company, its succes- sors and assigns. These assignments were duly recorded in the proper records of Hancock county, long prior to the beginning of this suit, and also long prior to the time it is claimed by the plaintiffs, the lease expired.

On the 14th day of May, 1889, and since, the business of the defend- ant Gas Company was the production of natural gas and supplying its customers therewith, and it owned a number of oil and gas leases; and one William Fleming, who was a producer of oil only, also owned a number of oil and gas leases, and these two parties entered into a mutual written obligation, whereby it is provided that if gas should be found in paying quantities on premises leased to Fleming, the right to develop and produce the gas vested in the Gas Company; and in case oil should be found in paying quantities in lands leased to the Gas Company, the right to develop and produce the oil vested in said Fleming and his assigns.

This instrument was also recorded. Its purpose and effect was and is, that the defendant, Natural Gas Company, assigned and transferred to Fleming the oil rights and interest which might be found on its lease-holds, in consideration of receiving from Fleming an assignment of the gas rights and interests which might be found on his leaseholds.

On the first day of June, 1889, Fleming assigned and transferred all his interests and rights in said leases and said mutual obligation to The Ohio Oil Company, defendant. After these transfers were of record, in partition proceedings for that purpose, thirty acres of the leased premises were set off to Mary J. Williams as her share of 109 acres, which left the 79 acres to the plaintiffs.

Mrs. Williams afterwards sold her 30 acres to Frank P. Blackford, and the Natural Gas Company, at his request, without objection by the plaintiffs, and also without their express assent, released the 30 acres from the operation and terms of its lease, and oil is being produced therefrom by the lessee of Blackford. The Natural Gas Company retains its lease as to the 79 acres in dispute, and the plaintiffs claim that its lease has expired, because gas or oil was not found thereon in paying quantities when this action was commenced, and that defendants had abandoned the only well and the entire premises.

On the 24th day of April, 1895, the plaintiffs made a new lease of the 79 acres to T. C. Kelley and C. C. Harris for oil and gas purposes. It is further shown by the pleadings as an undisputed fact, that the annual rental of one hundred dollars, called for by the lease of September 14, 1886, has been promptly paid to plaintiffs in advance each year, paying up to Febuary 1, 1896; and The Ohio Oil Company claims, that while the gas was no longer found in paying quantities at the one well, it has the right to drill for oil at other points on said premises by reason of its contract with the Natural Gas Company, and was preparing to do so when enjoined; and both defendants claim that there had been no abandonment of the premises, and that the lease was still in force as to both defendants. These adverse claims furnish the controversy between the parties.

We have thus given the facts not controverted in the pleadings at considerable length, because their averments and admissions narrow the case to a small compass.

What, under the terms of the lease and the testimony, are the rights of the parties?

The lease states : "That the said party of the first part for the consideration of the covenants and agreements hereinafter mentioned, has granted, demised and let unto the said parties of the second part, their heirs and assigns, for the purpose and with the *exclusive right of drilling and operating for petroleum oil and gas, with the right to sub-let and sub-divide* all that certain tract of land, etc." (Describing the 109 acres.)

The next provison reads :

"The party of the second part, their heirs and assigns, to have and hold the said premises for the said purposes only, for and during the term of five years from the date hereof (September 14, 1886), *and as much longer as oil or gas is found in paying quantities.*"

Again: "It is further agreed that if gas is found in quantities to be utilized and sold, the consideration in full to the party of the first part shall be $100 per annum for each and every gas well drilled on the premses herein described and so used."

Another material provision of the lease is:—

"Provided, in case no well is completed within one year from the date of this lease, then this lease shall be null and void, etc."

It is further provided, that if the lessee fail to pay the consideration named at the time agreed upon, the lease shall be null and void. We have already observed that a well was drilled within the year which produced gas in paying quantities, and it is conceded that the Natural Gas Company promptly paid the $100 per annum in advance each year, including the year from February 1, 1895, to February 1, 1896, covering a period of at least nine months after the plaintiffs commenced this action. It is a fact also not in dispute, that this gas well was used and operated by the Natural Gas company for the production and supply of gas until some time in. December, 1894, when it declined and was exhausted. There is no evidence in the case that plaintiffs ever requested or demanded any additional wells or development for oil or gas; nor has there been given us any evidence that any additional wells were necessary for the protection of the premises from operations on adjoining lands; and we are not advised of any ground of complaint against the Gas company until in December, 1894, or January, 1895.

The plaintiffs were personally present at this trial, and one of them was a witness, but no evidence was given as to any neglect or default on the part of the company, prior to January, 1895. In December, 1894, just what date we are not informed, the existing well declined and was disconnected from the gas line, and in the latter part of that month or the early part of January, 1895, The Ohio Oil Company, by virtue of its rights under the contract already referred to, erected a rig over the old well, and endeavored to draw the tubing so the well could be cleaned out and drilled deeper, and otherwise improved for oil or gas.

For a period of six weeks or more the effort to get the tubing out continued, and finally was given up as impracticable. This was not far from February 1, 1895. An agent of the defendant testifies that when he took the check to plaintiffs to make the payment for the year embraced between February 1, 1895, and February 1, 1896, he told them it was doubtful about anything being made out of the old well and that they might have to drill a new one, and asked for a suggestion as to another location. They said, east of the old one. The plaintiffs, although in attendance at this trial, do not deny this. Donnell, an agent of the defendant Oil company, testifies that about April 20, 1895, he drove a stake for another well location. Davis says he was present when the stake was driven, and that it was the 20th or 21st day of April, 1895. Connected with this fact is that stated by Frank Cooper, the saw-mill man, that between April 15th and 25th he placed lumber on the premises for a rig, etc., at the request of the Oil company. Donnell also says that in conversation with plaintiffs they told him that when they received the last one hundred dollars, they knew the old well was not producing gas. There is no denial of these facts, and they are in harmony with the nature of things on the farm at that time.

But the plaintiffs, notwithstanding all this and the payment made, claim that the lease by its terms expired in December, 1894, because neither oil nor gas was *then* found in paying quantities, and it is argued for them, that if the term had thus expired, the payment of rental for the well for another year would not and did not work an extension of the old lease. As this is the vital point in plaintiffs' controversy, we again

look to the lease to see if such is its construction. "The party of the second part, their heirs and assigns, to have and hold the said premises for *the said purposes* only, for and during the term of five years from the date hereof and *as much longer as oil or gas is found in paying quantities.*"

Does this language mean that it is only so long as gas or oil is found in paying quantities in the first well drilled, and that when it fails, the lease expires as to the entire premises ? The *whole premises* are held by this lease for five years and as much longer as oil or gas is found in paying quantities. Not found in paying quantities in *one* well, but found in such quantities when proper and reasonable search is made for it.

If this one well had ceased to produce gas within one year after the expiration of five years, would the lease have then expired, or could not the lessee develop, if he could, the same product on other parts of the premises? He certainly could, because the finding of oil or gas implies all the requisite efforts to discover and produce it. Hence it is, that if the defendant, after the old well was exhausted in December, 1894, made reasonable effort to find oil or gas by further deepening and cleaning it, and otherwise treating it, as experience and skill should dictate, and failing there, made reasonably prompt effort to find it at other locations on the leased premises, and there found it in paying quantities, it would be extravagant to claim that the lease had expired with the first well.

Then, did the defendant so neglect to exercise diligence in seeking oil and gas elsewhere on the lands as to amount to an abandonment of the lease? Efforts on the old well ceased about the latter part of February. A new location was staked on or about the 21st of April, and rig timber placed there about the same time. The annual rental for the old well, or some well, had been paid up to February 1, 1896, and in accepting the same, the plaintiffs recognized some right in defendants to go upon the premises.

It is true, the old rig was removed to another farm, and the gas well remained disconnected, all the tubing removed that could be drawn, part of the gas line removed—concede it all; but did not the new things that were done and attempted to be done, amply take their place, and more? But the title of defendants does not depend upon open, notorious, continuous, adverse possession, where the occupant, as a court has said in an old case, "must keep his flag flying."

Their continuous presence, actual or by symbol, on the premises is not essential, for such is not the source or character of their title, and their absence therefrom disclosed in this case, amounts to neither surrender or abandonment.

The plaintiffs say in their petition, "That said land every part thereof is supposed to be and probably is valuable oil land, and capable of producing oil in paying quantities."

It seems unreasonable to so construe this lease, that it expired when the old well ceased production, without allowing to the lessee a reasonable opportunity to find it at other locations on the premises. Why not allow it to explore this oil producing land rather than a stranger?

It was not over forty days from the giving up of the old well until the new was selected and work begun. We cannot find that the lease expired; nor can we find that defendants abandoned the premises. They abandoned the one well, but that is very far from an abandonment of the premises.

___ It has been urged upon us by counsel that when the Natural Gas Company released to Blackford the thirty acres by him purchased from Mrs. Williams, one of the Blair heirs, that in law it released as to the entire premises. We cannot so regard it. The company was authorized to "sublet and subdivide" the entire lands. It could assign to another, part or all of its leasehold. Nothing more was done in this case, and not as much was attempted.

Coming to the only remaining branch of this case, we find that Kelley and Harris took their lease on April 24, 1895. This was after the payment for the year up to February 1, 1896. It is proven on this trial that Kelley testified in the lower court, that the plaintiffs had told him of this payment; and that he knew of the contract between the defendants already referred to. Prior to the date of their lease, the Oil company had staked a new location, and had part of the lumber on the ground for a new well. Hence Kelley and Harris are not innocent in the transaction, and their claim must abide the fate of plaintiffs' case. We have considered the opinion of Judge Bentley of the Sixth circuit cited by counsel for plaintiffs, as well as the case in the 40th American State Report. We do not disagree with these cases, but they stood on facts entirely different, and we must decide upon the facts peculiar to the issues before us. We find for the defendants. The injunction is dissolved and plaintiffs' petition dismissed at their costs, for which there is judgment and the cause is remanded for execution for costs.

*George H. Phelps* and *A. Blackford*, for Plaintiff.
*M. F. Elliott* and *John Poe*, for Defendants.